This is number 08-3102, Donald A. Racino against the United States Postal Service. Mr. Nelson. Thank you, Your Honor. In this case, in a nutshell, what we're talking about here, when the Postal Service wants to discipline somebody, the discipline has to be based on the information and the materials contained in the charge and the documents supporting the charge. It has to be based on information in the file and can't be based on ex parte information, whether that's ex parte information obtained from other people, or ex parte assumptions that the decision maker is making, and that the discipline has to be within the bounds of reasonableness using the Douglas factors. Now, it's clear to me, frankly, that all three of these standards have been violated by the Postal Service. So are you here challenging just the penalty or the whole thing? I'm challenging the whole thing, but I'm focusing on the penalty just because of the matter of time. I think the brief discusses the ex parte communications, it discusses the assumptions which were totally unsupported and frankly wrong that were made by the decision maker, and it discusses the fact that the decision maker went outside of the charges to make his decision. I'm focusing on the penalty for as much time as I have. For the penalty equation, they are entitled to consider past work record, for instance, right? If the charges look at that. I mean, if the charge has that. No, don't they have to? You would ask them to look at the good parts of his record, right, that he had served for many years and had not suffered any discipline. Couldn't they also look at the fact that, hypothetically, an employee had been transferred every six months because he couldn't get along with his or her fellow workmates? Could they look at that as part of the work record? If it's relating to the charge or if there was actual discipline, yes. If it's not related to the charge, I would say no. I mean, if there's a comment from three years ago that it is understood that Mr. Jones got into a fight or Mr. Rossino got in a fight but we have no evidence to support it, then that shouldn't be considered. I mean, that's not anything to do with the charge, and it's not a discipline that he would receive. So in this case, and I'm going to stay with the reasonable penalty here, Mr. Anderson, the deciding authority, the postmaster, didn't do anything with regard to considering the Douglas factors. I mean, if you look at page 52, he says, I've taken into consideration all of the relevant Douglas factors, including the nature and seriousness of the offense, the fact that you are in a supervisory position and are held to a higher standard of conduct, the clarity with which you are on notice of your obligations under the applicable regulations in the absence of any mitigating factors. I have also considered the adequacy of effectiveness of alternate sanctions and whether a lesser penalty would deter you and or other employees from such misconduct, and I find that a lesser penalty is not appropriate under the circumstances. That is his entire consideration of the Douglas factors. There's no discussion whatsoever. So what more is required? Well, if you're going to say there's no mitigating circumstances, maybe you should at least say, I find nothing. I find that you didn't have a law of service. He just said that. He said there are no mitigating circumstances. He said there's none. What is he supposed to do? List the nothing that he found? I didn't find this. I didn't find this. I didn't find that. Well, he ignored the mitigating circumstances that were there, and there were plenty of mitigating circumstances, but part of the reason he ignored them was because he totally misconstrued the facts. But isn't 20 years of service a mitigating circumstances? Isn't 24 years of service? Well, that's the work record. He considered that. No, he didn't. He never mentions that. He never mentions that he worked for 24 years. He never mentioned that he worked for 24 years without any discipline. He didn't have any prior discipline. Another matter that I would consider a matter of mitigation was the fact there was no written reprimand ever given to this person. He's being terminated not for fighting with an employee or destroying government property. He's being terminated for the alleged violation of a verbal order by a supervisor that said, stay the fuck away from Jane Barber. That's the order. It's not in writing. We have no record of that order being actually given. Despite the fact that the person who gave the order, Mr. Parker, says that he wrote down exactly what he was said and gave it all to labor lawyers. But where are we in this case? I mean, the AJ, I don't know how long the hearing was, but there's almost a 50-page opinion in which he or she goes through all of the testimony, makes findings, makes credibility determinations, and the AJ concluded that this statement, in fact, was made at the time it was alleged to have been made. Okay. So you want us to – No. Do you think there's not enough evidence to support that finding? Well, that's a separate argument that I don't want to address right now. That's in the briefs and I'll leave it. Okay. But the fact is it's a verbal order. It wasn't put in writing. There's nothing that made it clear at that time. And so he's found in a break room with another employee, Anne Jane Bartle, having a conversation. Nothing inappropriate handling it. That is the trigger, supposedly, for firing this person who's worked for the post office for 24 years. He's never had a written reprimand. Now, what's interesting that wasn't considered by anybody in this case is three weeks after – But he was instructed specifically to stay away from that particular person. Yeah. There were complaints that this particular Ms. J.B. was receiving preferential treatment from the supervisor. There supposedly was complaints, but there's absolutely no evidence that there were – First of all, there's no evidence there were such complaints. What we have is a statement that Mr. Cintron, who never testified, received anonymous complaints that no one who testified ever saw. Wait. Are you suggesting that the Postal Service didn't have the authority to order him not to deal with this woman on a personal level? No. I'm not suggesting that. So if they had the authority to do it, and that's what they did, and he violated their order, isn't that something that would warrant some sort of discipline? Absolutely. Absolutely. I'm not saying there shouldn't be discipline given those facts that they're being alleged. I'm saying that the discipline is totally disproportionate to anything that's reasonable. Let me finish this question. By the way, you said they didn't consider his work record. They referred to it as his prior history, didn't they? And they referred to that a great deal. I don't see where you're saying that. Throughout the proceeding, the agency made repeated reference to Appellant's prior history. Even the proposal notice cited to the Appellant's prior history. I'm reading from page 28 of the administrative judge's report. I was going back to the proposal notice. It should be noted that the Appellant's prior history had nothing to do with a record of discipline. More directly, it references commonly known allegations involving Appellant and subordinate female employees. I could go on, but you've read this yourself. He had a record of inappropriate interaction with female subordinates. No, he didn't. That's what's found here. That's part of the problem. That's one of the assumptions that Mr. Anderson makes. He had a woman in 2001, four years, five years before this ever occurred, a woman did make an allegation of sexual harassment. She was immediately, he was immediately separated. He was exonerated. He was separated from her. Seven months later, she was terminated. After she had been away from his supervision for seven months, she was terminated. She filed a claim against the Postal Service alleging, one, sexual harassment, alleging, two, that she was terminated for filing complaints with the Postal Service. That's the action. It's not a history of sexual harassment. It's not a history of sexual complaints. It's that one incident. That's all there is. Yet, Mr. Anderson not only heard that there's sexual harassment complaints, he said in the record that he made the determination that Mr. Racina was culpable of that sexual harassment. And he said, because they forced him to transfer, he must have been culpable. That's the quote. And that's where, that's totally outside of the record. Certainly is not a matter, he's making a matter that is basically anti-mitigation. But to get to the point, the administrative judge says, I find the agency met its burden of showing appellant's conduct detracted from his reputation as a supervisor. It's clear from the testimony that appellant's effectiveness was compromised by his interaction with Ms. J.B. We could go on. But what is he using for those assertions? When you look at all these items, they throw a bunch of paperwork in there, and they're frankly smoke and mirrors for the most part. They throw in an interview with a Mr. Zimmerman. Mr. Zimmerman says, I've known, I've been around him for a year. Yes, he did seem to be with Jane Bartle more than other employees, but I never saw anything unprofessional. But I don't see why it's smoke and mirrors. I thought we already had this exchange. It was beyond the authority of the Postal Service under the circumstances in this case to order him not to have personal contact with this one individual. And what's smoke and mirrors about the fact that they have the authority and the right? I got sidetracked because so much of this is anonymous, and I think it's totally unprofessional. But review of the evidence file shows that appellant's personal relationship with Ms. J.B. was common knowledge. Are you denying that? That there was a perception that he had a relationship with Ms. J.B.? It doesn't say that. It's a common knowledge. And they go on to an email that talks about it, and then another email, and then a testimony from Mr. Zimmerman and Mr. Francione. And you have to look at, it's not testimony, it's the item in the record. In his email, Mr. Zimmerman stated. You're right. And what's he state? I mean, look at it. He says he never saw anything inappropriate or, you know, by him. He just said he spent more time. And it doesn't even have a time frame. It doesn't say when this occurred. It doesn't say whether it occurred in August of 2005 or whether it occurred in January of 2006. But I want to go back to the point that I keep on trying. Right, because all of that, I don't see how it has any bearing. After this incident of January 29th, where he was found in the room. Okay. The question is how serious that is. We can argue about it. But three weeks later, three weeks later, he is called into Mr. Parkhurst's office, and Mr. Parkhurst reads him the Riot Act. And he says, and that's on page 63. He makes it crystal clear at that point. I gave Don instruction that he is not to speak to Jane at all while on this property. I told him he must disassociate himself from Jane completely to the point that even if overtime is called, a different boss would have to inform her. He makes that, and he records this conversation in writing. That's February 22nd of 2006. There is nothing that occurred after that. He was terminated five months later. They didn't even start anything for three months. Now, that should be something seriously taken into consideration when you're talking about a matter of mitigation. Every place in the world, every human resources person in the world, the idea is you discipline someone in order to get them to correct their behavior. In this case, they gave him some verbal warnings. Maybe it didn't work. They finally come to him on February 22nd, and they give him something. They still never gave him a copy of it, but they made it crystal clear, look, this is serious stuff. We're not going to tolerate this anymore. And they made it crystal clear what's expected. Stay away from her. And they made that February 22nd. There were no further violations. Now, isn't the fact that he's five months in the clear? This worked. Most employers say, great, you know, we finally got him to clean up his act, and there's no more problems. They turn around, and they fire him. And they don't even consider that as a matter in attenuation of the disciplines to be given. That's a serious and important point. You're into your rebuttal time, Mr. Nelson. Maybe you should keep what's left. I will reserve the little time I've got. Thank you. Okay. May it please the Court, the decision of the MSPB should be affirmed because it correctly held that Mr. Racino received and violated a direct order, and because of the terminating. But that wasn't the violation, was it? It was unacceptable conduct by a supervisor, not violation of a direct order. He was ultimately terminated because he received a direct order to stay away from her and because he violated that order. What was the charge? The exact charge is that he failed to adhere to these instructions and therefore violated Section 665.15 of the Employee Labor Relations Manual. And that section provides what? That there should be no informal relationships? No, that section actually deals with an employee's duty to follow instructions. And when he is given an instruction, to follow that instruction and file any petition or complaint with that instruction later. But ultimately, the employee, when given an instruction, is expected to follow it. In this case, as stated in the proposed removal letter, which is on page 55 of the appendix, Mr. Racino was repeatedly instructed to stay away from Ms. Bartle, to limit his fraternization with female employees because he was a supervisor, and he repeatedly violated that. I'm reading the charge is unacceptable conduct, but you're saying part of the unacceptable conduct is failure to follow instructions. Is that it? Correct. It was his repeated intent to ignore those instructions, which were to stay away from her. What's troubling me in this case is really what the concurrence and dissent in the MSPB said. Now, she essentially raised three problems that she had. It seems like these were all in the context of the penalty stuff, although it's a little ambiguous to me. But she raises the fact that the past history that Mr. Anderson testified that he considered all of the evidence in the agency file, including the appellant's past history. Two, she says that he considered trivial matters like lunch, and these matters were not cited in the notice. And three, she said that this thing about he got wrong on the issue of the reassignment. How do you respond to that? I mean, are those relevant to the appropriateness of the penalty? And if not, why not? They are not directly relevant to the appropriateness of the penalty, and the reason is that all of those considerations are things that the administrative judge directly evaluated in determining whether the deciding official, Mr. Anderson, had taken into account ex parte communications before making his decision. And the administrative judge ultimately concluded that even taking all of those out of consideration, that there was still a reasonable basis to terminate Mr. Rossino for his crime. Well, was there testimony? Did anybody ask the deciding official, if we removed all of this from your consideration, would you still have fired this individual? Yes. Mr. Anderson did testify that even if he knew that, he still would have believed that termination was proper. What page are you referring to? It is on page 47 and 2. See, I have trouble finding. I mean, on 47, it does say that the AJ is drawing that conclusion. It says, even assuming the deciding official considered matters he should not have, I find the charge of unacceptable. But I don't see where she's referencing what the supervisor says he would have done. Oh, that Mr. Anderson testified to that? Yeah. Your Honor, no, I'm sorry. I do not believe that. Is that the way it goes? I mean, can we stay up here and make decisions sort of, you know, after the fact for what the supervisor would have done? I mean, is that fair game for the AJ to say, well, I assume, or if I were in his shoes, I would have reached the same result even taking away all of these improper considerations? The administrative judge looked at all of the evidence and determined that given the repeated history of Mr. Racino failing to follow the orders and given the fact that he was considered disruptive in the workplace. But doesn't Mr. Nelson have a point emphasized by Board Member Sapin that he had 24 years of unblemished service? Where is this repeated allegation coming from? If you weigh one misstep against 24 years, isn't this a bit harsh? Yes, there could be other ways that the agency could have decided to discipline him, and the agency is not disputing that. However, Mr. Racino was a supervisor. He repeatedly decided to disregard instructions by his supervisors to stay away from Ms. Bartle, to stay away from the female employees, and the proposed termination letter even says... You're going beyond the findings, aren't you? Wasn't he really focused on that incident where they were observed in conversation in the presence of another person? Will you say that there were repeated violations? Ultimately, the fact that he was found in the swing room with Ms. Bartle was the triggering factor for the ultimate termination. However, the proposal letter does say that he had been instructed when he first arrived based on his prior relations with female employees to stay away from employees. He was then again talked to in November 2005 to stay away from employees. Is that in the decision? That's on page 55 in the proposed termination letter detailing the basis for the proposed termination. And then ultimately, it says that these warnings went unheeded, and on January 23rd I issued you a direct order to disassociate yourself, which was given after pure exasperation on the part of the agency for Mr. Racino's failure to follow this, for his showing of preferential treatment to Ms. Bartle, for his repeated intent to disregard these orders. But wasn't he in a tough spot? He's a supervisor, and in the event of overtime, he would be required to supervise Ms. JB, right? Yes, Your Honor. So they're kind of asking him to do something. It puts him in a fundamental quandary. Yes, Your Honor. The actual language of the order, while yes, harsh and yes, broad, given the circumstances that it was given in, in light of pure exasperation for Mr. Racino's failure to listen to all the prior orders, which dealt with not his interaction with her in a supervisory role, but his interaction with her in a personal stand, in a personal relationship. In the context of that, the administrative judge evaluated that and clearly found that it was clear that it was not that he was terminated for supervising her and for speaking with her about things that were related to the workplace, but he was ultimately terminated because he was, again, violating this order to stay away from her, to not have personal contact with her. So the postal regulations prohibit friendship? They must draw a line somewhere as to what kind of ordinary human interactions can take place among the employees? Is that right? In this case, because he was a supervisor and she was a subordinate  it was making it more difficult to manage the other employees. So there was evidence, testimony that at the workplace they were behaving improperly? There is no evidence that they were behaving improperly at the workplace. However, it was the repeated showing of preferential treatment to her, the fact that it impacted the workplace, the morale of the workplace. But there was no repeated showing of preferential treatment. There might have been allegations. There wasn't a showing of preferential treatment, was there? There were all the other employees who complained to their supervisors. But that's perception. Isn't Mr. Nelson right about that, that that's all kind of rumor and innuendo? I imagine any organization, I bet we even gossip about each other now and then. But we shouldn't have people losing a job of 24 years based on that, should we? It is perception. It could be rumors, it could be perception. But isn't that critical as to how substantial the infractions were to the point where the employer, the United States, could say we can't have that going on among our employees? It isn't critical to the evaluation in this case because ultimately the basis for his termination is that he, as a supervisor, elected to disregard orders to stay away from her, elected to disregard orders that were intended to improve the morale. For which the only evidence, as I recall, was this conversation in the break room at which a third person was present. Is that correct? That is the evidence that occurred after the order on January the 23rd, after the rather profane order. But he was fired for failing to follow orders, so that's what we're talking about, isn't it? But prior to that order there's evidence that there were other situations and other interactions with Ms. Bartle in the record, which led to, again, the pure exasperation of the Postal Service in wanting him to stop this and him not listening to them. It was their decision that he decided intentionally to be with her in the break room. He had repeatedly decided to disregard these orders. His actions were causing a drop in morale. They were causing disruption in the Postal Service. I do think you're going outside of what we've been told in the record when you tell us that there was repeatedly this and repeatedly that. I don't believe that those were the charges. Well, the charge in the proposed termination letter does say that based on his interactions with her, based on their understanding when he first got there of his actions with female subordinates in another location, that was the ultimate basis for the direct charge on the 23rd and then his, again, failure to listen to that charge when he was found speaking with her in the swing room about things that were not related to the workplace. It was the ultimate basis for the termination. And that's all on the proposed termination letter on page 55 of the appendix. Given all of that, the nature and seriousness of this charge and the evidence as found by the administrative judge that the direct order was given in light of the fact that Mr. Rossino himself admitted that he received the order in January and that it was given to him. The order was received, the order was violated, and the termination was within the bounds of reason. Before I turn, can I just ask one question? And it goes back to, I think, Judge Rader's very first question to the other side, which is just the state of the law in terms of in considering the Douglas factors, to what extent you can go beyond the precise record that was related to the charge itself. You recall that exchange with Judge Rader. Do you have the case, or do you know explicitly, is there some case that sets out what you can consider and what you can't consider with respect to the Douglas factor consideration? I don't have a case on that, Your Honor. The Douglas factor consideration, though, does state that the bounds be struck in light of all of those factors, including past history, including mitigation, including past discipline and ability to perform. And so given all of that, while I don't have a case on point that would say that, it's clear that the deciding official can take all of those factors into consideration, which would be contained in the employee's file. Well, am I right that that leads to possibly a little confusion with respect to Member Sapin's dissent concurrence? Because she seems to be talking about the penalty, the reasonableness of the penalty, and yet she cites the fact that her concern, which I understand, over the fact that Mr. Anderson considered other things like past history. But you're telling us that at least with respect to the consideration of the Douglas factors, he's absolutely free to do that, right? He cannot consider under Stone, which is the case that discusses the due process violations. Under that case, he cannot consider ex parte communications that the employee would not be privy to, that the employee would not have an opportunity to be able to defend against. In this case, the proposal letter was given. The proposal letter indicates the past history, indicates the prior instructions to him. Yeah, but in a context not to which he would necessarily challenge it, because they're not relying on that. I mean, it's like historical information in the notice of the proposed removal. Yes, and then ultimately talks about the most recent, which was the January situation, the order given and then the violation of that order. But he wasn't being charged with anything to do with any of his conduct prior to January of 2006, correct? Even though it references that. The way that the proposed letter reads is that it's a culmination of all of that, that his repeated failure, his desire to unheed those warnings and his intent to unheed those warnings and ultimately leading to the Postal Service's need to give him this strong, harshly worded admonishment and then his desire again to be found in the swing room and to violate that. Thank you. Thank you, Ms. Goodman. Mr. Nelson. Your Honor, there was never, there was only two orders. It was an order on January 23rd, a verbal order to stay away from her. And then there was the order on February 22nd, which was encompassed in writing. There were a number of alleged incidents that may or may not say that there were preferences that were in the fall, September, October. These lunches are alleged in October. And then on 11-18, November 1805, when at the instructions of Mr. Cintron, Mr. Parkhurst, with another employee nicknamed Emotion, sat down with Mr. Racino and said, here's what we expect. Now, he wasn't given a reprimand, but he was said, do you understand that you're not supposed to have a personal relationship with an employee you supervise? Do you understand you're not supposed to give rides to an employee that you supervise, et cetera? Mr. Parkhurst testified that that was a consultation, it wasn't an order, it wasn't a directive. Mr. Parkhurst further testified at the hearing that after that incident, things improved until the Edwards incident. And when he says the Edwards incident, he's referring to the January 29th situation where Mr. Edwards found the three of them in a break room. There's no order prior to this order of January 23rd. Now, and it's also clear from this, you know, from the notice of proposed removal, it's clear that, you know, unacceptable conduct is a pretty broad and vague and ambiguous term that probably means anything the employer doesn't like. But when they talk about what is the unacceptable conduct, they are stating this order. That's all they're referring to. They talk about, you know, we gave you this order, you violated it. He violated it. Whether he intentionally violated it, his testimony, he was in the break room and she came in, okay? He didn't intentionally, you know, bring her in. Nobody has anything to dispute that. Okay, maybe given the order he was given, maybe he should have left because he was told to stay away from her. But that's hardly a crime that's worthy of someone getting terminated from their job after being there 24 years. And again, once it was made clear on February 22nd, exactly, he's supposed to stay totally away from her. He's not even to deal with her on a professional basis on the line talking about overtime. There were no further problems. I mean, that goes to show that this is, you know, once they let it be known clearly, he followed it. There were no problems. And that's an important point. And I want to hit one other point in mitigation because Mr. Anderson said that no lesser penalty would be effective. Now, it's hard for me to comprehend how a demotion to a lesser, you know, out of the supervisory ranks wouldn't be effective. He actually requested that, which should be another consideration that you're talking about in mitigation. He requested to be transferred. He requested to be demoted, showing he wants to get away from this perception. Nobody considered that something in his favor. And if they had demoted him, he wouldn't be in a position to give favoritism. He would be out of the situation. He would also, there wouldn't be any problem with him having breaks with fellow employees if he was demoted. And that certainly is a very reasonable alternative that Mr. Anderson simply never addresses. He just says there's no less effective means of disciplining this person. Okay. Am I gone here? We have to close it down, Mr. Nelson. Thank you. Thank you, Your Honor. Thank you, Ms. Goodman. Case is taken under submission. All rise.